Carl H. COCKRELL,
Plaintiff-Appellant,

v.

BOISE CASCADE CORPORATION,
Defendant-Appellee.

No. 84–2225.

United States Court of Appeals,
Tenth Circuit.

Jan. 6, 1986.

174

Brian G. Grace, Wichita, Kan. (Susan K. McKee, Curfman, Harris, Stallings & Snow, Wichita, Kan., with him on briefs), for plaintiff-appellant.

Stephen M. Kite-Powell, Boise Cascade Corp., Boise, Idaho (Julie M. Marsh, Boise Cascade Corp., Boise, Idaho, and Mikel L. Stout and Gloria G. Flentje, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., with him on brief), for defendant-appellee.

Before McKAY and MOORE, Circuit Judges, and WEST, District Judge.[*]

JOHN P. MOORE, Circuit Judge.

This is an appeal from a judgment granting the defendant's motion for a directed verdict in an employment discrimination case. We reverse and remand for a new trial.

The plaintiff, Carl H. Cockrell, brought this action in the United States District Court for the District of Kansas under the Age Discrimination in Employment Act, 29 U.S.C. § 626 (1982) (ADEA).[1] Cockrell alleged that the defendant, Boise Cascade Corporation (Boise Cascade), illegally discriminated against him because of his age by offering him a demotion with the intent of forcing him to leave the company.

In directing a verdict for Boise Cascade, the district court stated that Cockrell failed to establish that he was constructively discharged and, therefore, failed to prove a prima facie case of age discrimination. Moreover, the court held Cockrell did not proffer any facts which would show that Boise Cascade's actions were motivated by a discriminatory purpose rather than legitimate business reasons. We disagree. A review of the facts will focus the issues presented by this appeal.

---

[*] Honorable Lee R. West, United States District Judge for the District of Oklahoma, sitting by designation.

1. Cockrell joined a pendent state claim for fraudulent misrepresentation. Although the district court also directed a verdict for the defendant on this issue, Cockrell does not appeal that ruling.

## I.

Cockrell was employed as an area manager for Lone Star Industries, Inc., on July 1, 1979, when the company's sixty-one lumberyards and building material facilities were purchased by Boise Cascade. As an area manager for Lone Star, Cockrell supervised five yards located in Kansas. After the Boise Cascade takeover, he retained his supervisory position under the new title of district manager.

Cockrell testified that shortly after the takeover his supervisor from Boise Cascade, John Simianer, asked Cockrell if he would like to return to his old job as manager of the Dodge City lumberyard. Cockrell had managed the yard for twenty-five years before his promotion to area manager. Cockrell replied that he didn't want to run a lumberyard again.

On several occasions, Cockrell attempted to question Simianer about new company procedures and his responsibilities to the five yards under his supervision, but his queries were rebuffed. Boise Cascade officers attended several meetings to explain to the yard managers aspects of the lumber retailing business that had previously been Cockrell's duties. Cockrell testified that he did not receive any other information from Boise Cascade relating to a reorganization of the corporation or a different management philosophy which would eventually eliminate his job.

Cockrell testified that in mid-November he became seriously concerned about his employment after a yard manager told Cockrell it was rumored that he would not be with Boise Cascade long. Nevertheless, he was unsuccessful in his repeated attempts to find out what he was doing wrong. According to Cockrell, he never received any indication, written or otherwise, from Simianer that he was not doing his job. To the contrary, Cockrell offered into evidence a letter dated November 27, 1979, praising him for an appraisal he had done on one of his yards and encouraging him to do the same with his other managers.[2]

On December 13, 1979, Simianer and Joel Richards, division employee relations manager, visited Cockrell in his district office. Simianer told Cockrell that he could accept the company's offer to manage the lumberyard in Dodge City, Kansas, or leave Boise Cascade. Salary was not discussed at the meeting, although Richards reminded Cockrell that if he chose to leave the company before December 31, 1979, he would receive $38,000 in severance pay from Lone Star.

As district manager Cockrell was earning $42,100 annually, plus expenses and a company car. Rather than accept what he thought would be a more than 40% reduction in pay[3] and an uncertain career with Boise Cascade, Cockrell refused the offer of employment and was terminated on December 31, 1979. Cockrell was then 57 years old. His position as district manager was filled by a man 39 years old who was paid less money and supervised more yards in Kansas and Arkansas.[4]

Between December 13 and December 31, 1979, Cockrell and Simianer spoke on the telephone twice. Although Cockrell want-

---

**2.** Cockrell also presented evidence that he had always received favorable appraisals from his Lone Star supervisors. Sales and profits in the Kansas yards were strong, and 1978 had been his area's best year to date. Cockrell admitted that he tended to be gruff with the managers who worked in his area, but testified that they had always been able to resolve their differences.

**3.** Several months prior to his termination, Cockrell attempted to negotiate a raise for the manager of the Dodge City yard and had been told by Simianer that the location couldn't support an annual salary of more than $24,000. Al-

though in previous years the manager of the Dodge City yard had earned bonuses which would bring his annual earnings to $40,000, Boise Cascade had changed the bonus program effective January 1, 1980, and in December 1979 it was unclear to the participating employees how the new program would affect total compensation.

**4.** The district manager position was eliminated two years after Cockrell's termination. Cockrell's successor was told the position would be short-term and remained with the company after the termination.

ed to discuss their differences and his termination, Simianer refused. Simianer never attempted to further explain the Dodge City offer, make any other offer of employment, or in any way encourage Cockrell to reevaluate his decision to resign.

At the December 13 meeting, Simianer told Cockrell that Cockrell had lost the respect of his managers. Cockrell later learned that Simianer told the Dodge City manager that Cockrell was terminated because he was not following the rules and doing things the way Boise Cascade wanted them done. The personnel report indicates that Cockrell chose to leave the company during the reorganization of the Kansas district. Cockrell evinced evidence that Boise Cascade would save more than $120,000 by his termination.[5]

Another former employee, Andy Anderson, testified that he had also been asked to choose between a demotion and leaving the company. Anderson was 61 years old and earned an annual salary of $48,000 plus expenses as an area manager of twenty-five Lone Star yards when Boise purchased the yards. Anderson testified that on December 13, 1979, two officers of the company offered him a position as product manager at $30,000 a year. Anderson resigned to take advantage of the Lone Star severance plan and was replaced by a man in his early thirties. He testified that he was never informed of any company-wide reorganization, nor did he know of any younger managers who were offered demotions to lesser-paying jobs to stay with Boise Cascade.

Cockrell also presented statistics which indicated that of the twenty-five middle management employees who, unlike Anderson and Cockrell, remained with Boise eight months, three received decreases in pay. All three were between the ages of 40 and 70. Moreover, a memo from Joel Richards listing acquisition decisions to be made by Boise Cascade officers discussed whether the company would retain employees older than 65 years of age.

Simianer and Richards testified that they were prepared to offer Cockrell the same salary he had been paid as a district manager to manage the Dodge City yard. Simianer admitted, however, that they never discussed salary at the December 13 meeting, nor did he elaborate on the offer to Cockrell in their two phone conversations subsequent to the meeting.

Boise Cascade officers testified that their management philosophy was to shift the responsibilities to the individual store managers and minimize the need for multiple levels of supervision. Toward that end, the company was strengthening the store managers, which in many instances meant intensive training. Simianer characterized Cockrell as inflexible, dominating, resistant to Boise Cascade's operating philosophy, and disruptive. He admitted that Cockrell was never expressly told that Boise Cascade intended to eliminate his position as soon as the Kansas managers became sufficiently independent. According to Simianer, the managership of the Dodge City yard would not have been a demotion for Cockrell since ultimately the stores would be more autonomous than under the Lone Star organization. Moreover, Simianer testified, the decision to relieve Cockrell of his supervisory responsibilities was based on his abrasive management style, which hampered training, and not his age.[6]

## II.

### A.

█ A directed verdict deprives the nonmoving party of a determination of the

---

5.  Under the Lone Star/Boise Cascade purchase agreement, the employees retained by Boise would receive credit for their Lone Star experience. When Cockrell left in 1979, he had twenty-nine years of experience. If he had stayed with Boise Cascade at his $42,100 annual salary until he was 65 years old, the company would have been liable for $121,775 in pension benefits. His termination also saved the company

the difference between his salary and that of his successor.

6.  Boise Cascade officers also stated that the performance of the Kansas yards and other objective criteria played little part in their decision to relieve Cockrell of his district managership.

facts by a jury and, therefore, should be cautiously and sparingly granted. *See Brown v. Reardon,* 770 F.2d 896 (10th Cir. 1985); *Wilkin v. Sunbeam Corp.,* 377 F.2d 344 (10th Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 464 (1967). On review of the grant of a motion for a directed verdict, the court must view the evidence and all reasonable inferences which can be drawn from that evidence most favorably to the non-moving party. *Smith Machinery Co., Inc. v. Jenkins,* 654 F.2d 693 (10th Cir.1981); *Brown v. Reardon,* 770 F.2d at 903. If there is evidence upon which a reasonable jury could properly find a verdict for the party opposing the motion, the motion should be denied. *Anthony v. Baker,* 767 F.2d 657 (10th Cir. 1985). In determining the sufficiency of the nonmovant's evidentiary showing, the trial court should refrain from weighing conflicting evidence, evaluating the credibility of witnesses, or substituting its judgment for that of the jury. *Smith Machinery,* 654 F.2d at 697.

These directed verdict standards are well recognized. They provide the context for our analysis.

### B.

■■■■ Section 4(a)(1) of the ADEA provides that it shall be unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." To establish a prima facie case of discrimination under the ADEA, the plaintiff must show (1) he is within the protected age group, (2) he was doing satisfactory work, (3) he was discharged despite the adequacy of his work, and (4) his position was filled by a person younger than he. *Schwager v. Sun Oil Co. of Pennsylvania,* 591 F.2d 58 (10th Cir.1979). The burden of going forward then shifts to the employer to show a legitimate, non-discriminatory reason for the challenged action. *Id.* Finally, the plaintiff must rebut the employer's showing by demonstrating that the proffered justifica-

tion is a pretext and that the age of the employee was a determining factor in the employer's decision. *E.E.O.C. v. Prudential Federal Savings and Loan Association,* 763 F.2d 1166 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

■■■■ We have held that a "constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir.1982). The test is whether a reasonable man would view the working conditions as intolerable and would feel compelled to resign. *Id.* In an age discrimination case based on constructive discharge, the employee bears the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him. *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

The finding of a constructive discharge must be justified by the "existence of certain 'aggravating factors.'" *Irving,* 689 F.2d at 173 (quoting *Clark v. Marsh,* 665 F.2d 1168, 1174 (D.C.Cir.1981)). Although each case must be analyzed on its own merits, *Irving* at 173, it is instructive to refer to opinions of other courts which have addressed the constructive discharge issue in the context of a perceived demotion or reassignment.

In *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir.1983), the court reversed a jury verdict for the plaintiff in an age discrimination case under the ADEA. The court held that the employee had failed to prove that her employer had intentionally created an intolerable working environment to force her to resign. The court noted that Pena, an administrator for a nursing home, had urged her employer to hire someone she could train since she would be retiring in less than three years. However, when Pena's eventual successor was hired, Pena was reluctant to delegate her duties or begin the training process. Pena was

eventually reassigned to a different role in the administrator's office and asked to oversee the work of her successor. Although Pena testified that she believed the reassignment would leave her with a title but no authority, the evidence showed that she was encouraged to remain with the home and was asked merely to facilitate her successor's training as well as pursue her own interest in legislative work. Moreover, the court stated, Pena was faced with no loss of pay or change in title. Under the circumstances of this case, the appellate court determined that the trial court erred in denying the defendant's motion for a directed verdict.

In *Doscherholmen v. Walters,* 575 F.Supp. 1552 (D.Minn.), *aff'd,* 754 F.2d 377 (8th Cir.1984), the plaintiff, a 68-year-old physician in the intermediate care ward of a veteran's hospital, was reassigned to examination and pension evaluation work in the outpatient clinic. He refused to report to the clinic and was terminated. He sued under the ADEA, alleging that the transfer was in fact a demotion prompted by his age. The trial court held for the defendants and stated that the plaintiff had not made out a prima facie case of age discrimination. The court concluded that although the plaintiff considered the transfer tantamount to being "put out to pasture," the evidence showed that his compensation and opportunity for teaching and research were to remain the same. Moreover, the plaintiff was encouraged not to resign and was reminded of a bonus program which would benefit him if he stayed.

In this case, the district court stated that Cockrell had failed to satisfy his prima facie burden of establishing a constructive discharge. In granting the motion for a directed verdict, the court stated:

> Compare ... other cases where we talk about the intolerable nature of those working conditions with the case here where the plaintiff, good health, twenty something years experience in yard management, lives in Dodge City; it's his home, knows the customers. Extended his car, car allowance, same benefits, 40 thousand dollar[s] a year, avail himself of a pension where after five more years he has the opportunity of thirty years attrition and when at age sixty-five starts drawing approximately eighteen hundred a month.

> I'm not the fact finder, but strikes me to submit that question as intolerable is to insult the intelligence of any jury.

Contrary to its contention and contrary to the law on directed verdicts, the trial court was acting as the fact finder in this case. Viewing the evidence in the light most favorable to the plaintiff, it is clear that Cockrell adduced sufficient evidence of a constructive discharge to survive a directed verdict. Cockrell testified that he had told Boise Cascade management that he was not interested in running the Dodge City lumberyard again. Nevertheless, Simianer gave Cockrell only the choice of running that yard or resigning. Simianer contended that the company did not intend to reduce Cockrell's salary and testified that the store managership was not a demotion under the company's reorganization plan. However, Cockrell testified that nothing was said about salary, nor had he been informed of the company's elevated role for yard managers. Whether he was reasonable in believing that his salary would be reduced commensurate with the prevailing wage at the Dodge City yard is an issue for the fact finder. Moreover, Cockrell and Simianer agreed that Simianer did not raise the salary issue or in any way encourage Cockrell to remain with the company after the December 13 meeting despite two opportunities to do so.

Although we do not presume to hold that the jury would have found that Cockrell was constructively discharged because of his age, we do hold that the jury should have been given the opportunity to review the evidence and weigh the credibility of the witnesses. Under the standards outlined in *Irving, Pena,* and *Doscherholmen,* we hold that Cockrell presented sufficient evidence of intolerable working conditions to warrant submitting the issue to the jury.

### C.

Boise Cascade's final argument in support of the trial court's grant of its motion for a directed verdict is that Cockrell failed to rebut its evidence of legitimate business objectives. Simianer and other corporate officers testified to a major reorganization which would rely more on stronger yard managers and less on middle management.

 An ADEA plaintiff is not required to show that age was the sole motivating factor in the employment decision, but only that age was also a reason, and that age was the factor that made a difference. *E.E.O.C. v. Prudential Federal Savings and Loan Association,* 763 F.2d 1166 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). Therefore, a plaintiff is not required to prove that the employer's reason is false. *Id.* "Where there is evidence of both a discriminatory reason and a legitimate reason, the fact finder must decide whether the promotion would have been granted but for the plaintiff's age." *E.E.O.C. v. University of Oklahoma,* 774 F.2d 999, 1002 (10th Cir. 1985).

Cockrell testified he was never told that his performance was unacceptable despite his queries; indeed, less than a month prior to the December 13 meeting, Cockrell had received a written commendation from his supervisor. At least three different reasons were given by corporate officers to explain Cockrell's termination. Although Boise Cascade contends that all of the reasons were related to the corporate reorganization, Cockrell presented evidence that he was never told about the reorganization or that it would eventually eliminate certain jobs. Finally, Cockrell presented evidence that several other employees in the protected age group had been offered lower-paying positions to stay with the corporation and that the age of the Lone Star employees had been a concern of the company's since it was contemplating the acquisition. This combination of factors provides sufficient circumstantial evidence from which a jury could have determined that a discriminatory purpose motivated the employer and Cockrell's age made the difference in the company's decision. *See E.E.O.C. v. University of Oklahoma,* 774 F.2d 999 (10th Cir.1985).

After reviewing the evidence in the context of the legal standards applicable to discrimination cases and in the light most favorable to the plaintiff, we conclude that the trial court erred in granting the defendant's motion for a directed verdict. Because Cockrell presented sufficient evidence from which a jury could properly have found Boise Cascade's actions amounted to a constructive discharge motivated by discriminatory intent, we reverse and remand for a new trial.